IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MICROSTRATEGY INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 03-1124-KAJ |
| | ) | |
| BUSINESS OBJECTS AMERICAS, | ) | |
| successor by merger to CRYSTAL | ) | |
| DECISIONS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| BUSINESS OBJECTS AMERICAS, | ) | |
| | ) | |
| Counterclaimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICROSTRATEGY INCORPORATED, | ) | |
| | ) | |
| Counterdefendant. | ) | |

## MEMORANDUM OPINION

Richard L. Horwitz, Esq., David E. Moore, Esq., Potter Anderson & Corroon LLP, Hercules Plaza, 6th Floor, 1313 North Market Street, P.O. Box 951, Wilmington, Delaware 19899; Counsel for Plaintiff-Counterdefendant.
  Of Counsel: Joseph P. Lavelle, Esq., Jennifer L. Dzwonczyk, Esq., Brian Rosenthal, Esq., Howrey LLP, 1299 Pennsylvania Avenue, N.W., Washington, D.C., 20004.

Josy W. Ingersoll, Esq., John W. Shaw, Esq., Andrew A. Lundgren, Esq., Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware 19801; Counsel for Defendant-Counterclaimant.
  Of Counsel: Daniel J. Furniss, Esq., Joseph A. Greco, Esq., Thomas F. Fitzpatrick, Esq., Townsend and Townsend and Crew LLP, 379 Lytton Avenue, Palo Alto, California 94301.

January 23, 2006
Wilmington, Delaware



JORDAN, District Judge

## I.    INTRODUCTION

This is a patent infringement case. Microstrategy, Inc. ("Microstrategy") has sued

Business Objects Americas ("Business Objects"), the successor to the original

defendant, Crystal Decisions, Inc. ("Crystal Decisions"), alleging infringement of three

patents: U.S. Patent Nos. 6,279,033 (issued Aug. 21, 2001) (the "'033 patent"),

6,567,796 (issued May 20, 2003) (the "'796 patent"), and 6,658,432 (issued Dec. 2,

2003) (the "'432 patent"). Before me now are the parties' requests for construction of

the disputed claim language in those three patents, as well as the following motions.

Microstrategy has filed a Motion for Summary Judgment of Infringement of the '432,

'796, and '033 patents. (Docket Item ["D.I."] 124.) Business Objects has filed a Motion

for Summary Judgment of Non-Infringement and Invalidity of the '033 patent (D.I. 101),

a Motion for Summary Judgment of Invalidity and Non-Infringement of the '796 patent

(D.I. 116), and a Motion for Summary Judgment of Invalidity and Non-Infringement of

the '432 patent (D.I. 109).[1]  Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1338.

---

[1]Microstrategy has also filed a Motion to Dismiss Certain Counterclaims Relating
to the '033 patent (D.I. 223). Because Business Objects agreed to voluntarily dismiss
those counterclaims (November 21, 2005 Hearing Transcript ["Tr."] at 7:25-12:12), I will
deny Microstrategy's motion as moot.

Business Objects has filed a Motion to Strike the September 13, 2005
Supplemental Expert Report of Peter Alexander (D.I. 85) and a Motion to Exclude the
Expert Testimony of Richard Troxel (D.I. 97). In response, Microstrategy has filed a
Motion for Leave to File a Supplement to its Opposition to Business Objects's Motion to
Strike (D.I. 219). I will deny as moot all of those motions because they pertain to expert
opinions on infringement and damages that I did not rely on here and because all
issues of patent infringement are either decided or rendered moot by the conclusions
set forth herein.

Business Objects has also filed a Motion to Exclude the Expert Testimony of
Peter Alexander. (D.I. 94.) As discussed below, *infra* Section IV.B.2 & n.6, that motion
will be denied as moot to the extent that it relates to the validity of the '796 and '432
patents or to patent infringement. To the extent that it relates to testimony on validity of

For the reasons that follow, including my decision on claim construction, I will grant Business Objects's motions for summary judgment as to noninfringement of the '033 patent (D.I. 101) and for summary judgment as to invalidity of the '796 patent (D.I. 116) and the '432 patent (D.I. 109). Accordingly, I will deny Microstrategy's motion for summary judgment as to infringement of those three patents (D.I. 124). I will also deny Business Objects's motion for summary judgment as to invalidity of the '033 patent (D.I. 101) and deny as moot Business Objects's motions for summary judgment as to noninfringement of the '796 and '432 patents (D.I. 116; D.I. 109).

## II.   BACKGROUND

### A.   Procedural Background

Microstrategy filed a complaint for patent infringement on December 10, 2003 (D.I. 1) against Crystal Decisions, which was acquired by Business Objects on December 11, 2003 (D.I. 6 at ¶11). Business Objects filed an answer on January 15, 2004 and asserted a counterclaim for a declaratory judgment of noninfringement and invalidity of the three patents. (D.I. 6.) Microstrategy filed its reply to the counterclaim on February 9, 2004. (D.I. 9.) The parties are scheduled to try this case before a jury beginning on May 30, 2006. (D.I. 73.)

On November 14, 2005, Microstrategy voluntarily dismissed its claims for infringement of claims 1-4, 10-12, 17, 18, 23, 27, 28, and 30 of the '033 patent and claims 14, 16, and 17 of the '796 patent. (D.I. 216.) Business Objects agreed to dismiss its counterclaims based on those patent claims. (November 21, 2005 Hearing

_____

the '033 patent, a decision on that motion will be delayed until after the parties inform the court as to whether the case will proceed to trial on that issue.

2

Transcript ["Tr."] at 9:1-8, 11:13-18.) Thus, by the parties' agreement, the patent claims at issue are as follows: claims 7, 8, and 21 of the '033 patent; claims 1, 4, 7, 8, 11, and 18 of the '796 patent; and claims 1, 2, 4, 5, 6, 9, 10, and 13 of the '432 patent. (Tr. at 11:6-11, 11:24-12:5.) Business Objects has moved for summary judgment of noninfringement and invalidity as to all of those claims. (D.I. 101; D.I. 109; D.I. 116.) Microstrategy has moved for summary judgment of infringement for claims 7 and 8 of the '033 patent; claims 1, 7, 8, 11, and 18 of the '796 patent; and claims 1, 2, 5, 6, and 10 of the '432 patent. (D.I. 124.)

B.   The Disclosed Technology

The three patents in this case each relate to business intelligence software. Generally, such software gathers, retrieves, organizes, and analyzes data contained in large databases to assist users in making business decisions. (D.I. 125 at 2; see also D.I. 102 at 4.) The software is sometimes referred to as a "decision support system" (see D.I. 102 at 4) and is intended to "efficiently retrieve selected information from data warehouses." ('033 patent, 1:47-48; '796 patent, 1:57-58; '432 patent, 1:17-19.) For example, decision support systems may provide sales reports broken down by category or geography. (D.I. 125 at 2.) "One type of decision support system is known as an on-line analytical processing system ('OLAP'). In general, OLAP systems analyze the data from a number of different perspectives and support complex analyses against large input data sets." ('033 patent, 1:49-53; '796 patent, 1:59-63, '432 patent, 1:20-24.)

Decision support systems may be implemented through web-based user interfaces, which allow a user to submit a request for a particular report through a web browser. ('033 patent, 3:30-31; '432 patent, 1:61-64.) Report output may be directed to

3

the web browser ('033 patent, 3:30-34; '796 patent, 5:63) and, according to one of the patents, may also be directed to other devices, such as fax machines, pagers, telephones, and electronic mail ('796 patent, 5:54-63). The three patents in this case are generally directed to systems and methods for improving the operation of such systems.

        1.    The '033 Patent

The '033 patent is directed to systems and methods for allowing users to submit report requests asynchronously and for preventing the processing of duplicate reports by checking new requests against a cache of previous requests. ('033 patent, 4:43-5:14.)

The asynchronous submission of report requests through a web browser allows users to continue to use their browser without being forced to wait for the report output. (Id. at 4:43-55.) In earlier systems, the browser would "lock up" while it waited for report results, so the user would be unable to use the browser window until the report was completed. (Id. at 3:34-37.) In the claimed system, after a user makes a request, the system returns control to the user interface, allowing the user to submit additional requests or perform other tasks. (Id. at 4:23-55.)

The '033 patent also discloses the use of a list of pending and previously completed requests to reduce duplicate processing effort. (Id. at 4:56-5:14.) A new request is compared to the list, and, if the request is substantially similar to a previous one, the system sends that previous report instead of processing a new one. (Id. at

4

5:2-14.) Figures 1 and 2 of the '033 patent illustrate this aspect of the claimed invention, in combination with the asynchronous submission of reports.

### 2. The '796 Patent

The '796 patent is directed to systems and methods for the automatic scheduling and delivery of reports to the user. ('796 patent, 3:55-4:14.) Instead of the user submitting an individual request for a report when needed, the system will set up a subscription service to automatically generate reports. (Id. at 4:15-35.) The patent also discloses a system for an "administrator module . . . to increase throughput, increase speed, and improve the administrator control over the processing." (Id. at 4:38-41.)

### 3. The '432 Patent

The '432 patent is directed to systems and methods for providing reports with less processing by the user's system. ('432 patent, 2:16-30.) By using a layered architecture and not using helper applications ("plugins"), processing is done by higher powered server systems rather than on the user's local system. (Id. at 2:20-30.) According to the patent, such a system improves efficiency, because the user does not have to download plugins and process report output locally (id. at 2:27-30), and it is more secure, because the user system does not have direct access to the database (id. at 2:17-20).

## III.   APPLICABLE LAW / STANDARD OF REVIEW

### A.   Claim Construction

Patent claims are construed as a matter of law. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454-56 (Fed. Cir. 1998) (en banc). "[T]he words of a claim 'are

5

generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  That ordinary meaning "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313.

To determine the ordinary meaning, the court should review "the same resources as would" the person of ordinary skill in the art. *Multiform Dessicants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).  Those resources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314.  Both "the context in which a term is used in the asserted claim" and the "[o]ther claims of the patent in question" are useful for understanding the ordinary meaning. *Id.*

"[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582).  In short, the claims "must be read in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  Thus, "[t]he construction that stays true to the claim language and most naturally aligns with

6

the patent's description of the invention will be, in the end, the correct construction."
*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

On occasion, "the specification may reveal a special definition given to a claim
term . . . that differs from the meaning it would otherwise possess. In such cases, the
inventor's lexicography governs." *Phillips*, 415 F.3d at 1316 (citing *CCS Fitness, Inc. v.
Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). The specification may also
"reveal an intentional disclaimer, or disavowal, of claim scope by the inventor . . . [,
which] is regarded as dispositive." *Id.* (citing *SciMed Life Sys., Inc. v. Advanced
Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001)).

The court "should also consider the patent's prosecution history." *Markman*, 52
F.3d at 980. "Like the specification, the prosecution history provides evidence of how
the [Patent and Trademark Office] and the inventor understood the patent." *Phillips*,
415 F.3d at 1317 (citing *Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1206 (Fed. Cir.
1992)).

The court may also rely on extrinsic evidence, which is "all evidence external to
the patent and prosecution history, including expert and inventor testimony, dictionaries,
and learned treatises." *Markman*, 52 F.3d at 980. In particular, "dictionaries, and
especially technical dictionaries, . . . have been properly recognized as among the
many tools that can assist the court in determining the meaning of particular
terminology." *Phillips*, 415 F.3d at 1318 (citing *Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313, 1325 (Fed. Cir. 2002)). However, extrinsic evidence is "less significant
than the intrinsic record in determining 'the legally operative meaning of claim

7

language.'" *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) (quoting *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1318 (Fed. Cir. 2004)).

During claim construction, "[t]he sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." *Phillips*, 415 F.3d at 1324.

## B. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of material fact, a court must review the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citation omitted). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P.

8

56(c). "Where the record taken as a whole could not lead a rational trier of fact to find

for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at

587 (internal citation omitted).  Accordingly, a mere scintilla of evidence in support of

the non-moving party is insufficient for a court to deny summary judgment.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

1.    Patent Infringement

A patent infringement analysis involves two steps: claim construction and then

the application of the construed claim to the accused process or product.  *Markman*, 52

F.3d at 976.  The first step, claim construction, has been held to be purely a matter of

law.  *Cybor*, 138 F.3d at 1454-56.  The second step, application of the claim to the

accused product, is a fact-specific inquiry.  *See Kustom Signals, Inc. v. Applied*

*Concepts, Inc.*, 264 F.3d 1326, 1332 (Fed. Cir. 2001) (Patent infringement, "whether

literal or under the doctrine of equivalents, is a question of fact.").  The patent owner

has the burden of proving infringement by a preponderance of the evidence.

*Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed. Cir. 1984) (citing *Hughes*

*Aircraft Co. v. United States,* 717 F.2d 1351, 1361 (Fed. Cir. 1983)).  Summary

judgment is appropriate in patent infringement suits when it is apparent that only one

conclusion regarding infringement could be reached by a reasonable jury.  *See*

*Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed. Cir. 2001).

2.    Patent Invalidity

When a party challenges a patent's validity, the starting point for analyzing that

challenge is the statutory presumption of validity.  *See* 35 U.S.C. § 282 ("A patent shall

be presumed valid."). Accordingly, "[t]he burden of establishing invalidity of a patent or

any claim thereof shall rest on the party asserting such invalidity." *Id.* Invalidity must be

shown by clear and convincing evidence. *Robotic Vision Sys. v. View Eng'g, Inc.*, 189

F.3d 1370, 1377 (Fed. Cir. 1999). This presumption of validity is never weakened, and

the burden of proving invalidity does not shift from the party asserting invalidity.

*Imperial Chem. Indus., PLC v. Danbury Pharmacal, Inc.*, 745 F. Supp. 998, 1004 (D.

Del. 1990) (citing *ACS Hosp. Sys., Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1574-75

(Fed. Cir. 1984) (other citations omitted)).

## IV.   DISCUSSION

### A.   Claim Construction

While the parties have identified several claim terms as requiring construction, I

will only discuss the two claim construction issues that are necessary to decide the

pending summary judgment motions. First, for the '033 patent, the parties dispute the

meaning of the term "asynchronously" in claims 7, 8, and 21. Second, for the '432

patent, the parties dispute whether the court may correct an apparent error in the

language of claims 6, 9, 10, and 13.

#### 1.   The '033 Patent

The case against Business Objects for infringement of the '033 patent turns on

the construction of the term "asynchronously" in the preamble of the asserted claims.

Claim 7 of the '033 patent reads:

> 7. A network-based system for enabling users connected via a
> network user interface over the network to an OLAP system to

10

**asynchronously** submit requests for reports to be processed by an OLAP system, the network-based system comprising:

> report receiving means for receiving a request from an instance of the network user interface for the OLAP system to process a report;

> storage means for storing a report entry for reports that have been requested, including reports requested by other users and reports that are being processed;

> report control means for adding a request by that user to the report entry of a particular report in the report list if the report requested by the user is substantially the same as that particular report contained in the report list so that a report is processed once and a result from the report is provided to each user making a request for that report; and

> on-line analytical processing means for generating requested reports.

('033 patent, 18:32-51 (emphasis added).)

Claim 8 is dependent on claim 1, and those claims read:

> 1. A network-based system for enabling users connected via a network user interface over the network to an OLAP system to **asynchronously** submit requests for reports through a single instance of the network user interface to be processed by an OLAP system, the network-based system comprising:

> > a network server module that interacts with network user interfaces operating on user systems to enable communications between the network-based system and the network user interfaces;

> > report receiving means for receiving a first request from an instance of the network user interface for the OLAP system to process a report;

> > control means for returning control to the instance of the network user interface to enable the user to utilize the same instance of the network user interface to enter a second request through the instance of the network user interface while the first request is being processed; and

> > on-line analytical processing means for generating requested reports.

11

> 8. The network-based system of claim 1 further comprising report control means for comparing a request from the user to existing report requests to avoid duplicating reports.

(*Id.* at 17:60-18:12, 18:52-54 (emphasis added).)

Claim 21 is dependent on claim 17, and those claims read:

> 17. A method of **asynchronously** processing requests for reports to be processed by an OLAP system submitted from a single instance of a user interface connected over a network to the OLAP system comprising steps of:
>
>> receiving a request from an instance of a user interface for the OLAP system to process a first report, wherein the request is received from a report request system that prevents user report requests from being entered through the instance of the user interface upon transmission of a report request;
>>
>> placing the report request in line to be processed;
>>
>> returning control to the instance of the user interface to enable the user to utilize the same instance of the user interface to enter a second report request through the same instance of the user interface while the first request is being processed; and
>>
>> processing requested reports on the OLAP system.
>
> 21. The method of claim 17 further comprising the steps of:
>
>> storing a report list containing a report entry for reports requested; and
>>
>> adding a user to the report entry for a particular report in the report list if the report requested by the user is substantially the same as that particular report in the report list so that a report is processed once and delivered to the users requesting that report.

(*Id.* at 19:19-36, 19:46-54 (emphasis added).)

a.     The Parties' Proposed Constructions

Microstrategy first proposes that the term "asynchronously" should not be interpreted as a limitation for claims 7, 8, or 21 because the term is part of the preamble, while the body of each of those claims "describes a structurally complete invention." (D.I. 179 at 9-11, 13-14 (quoting *Intirtool, Ltd. v. Texar Corp.*, 369 F.3d 1289, 1295 (Fed. Cir. 2004).) Alternatively, if the term is construed as a limitation, Microstrategy proposes that the limitation should not apply to the specific report requests that are added to the report entry by the report control means in claim 7, or that are compared to existing report requests in claim 8, or that are added to the report entry in the final step of the method described in claim 21. (D.I. 179 at 11; D.I. 191 at 26-27, 29-30.) Essentially, Microstrategy's second argument is that the "asynchronously" limitation should not require "that asynchronously submitted report requests must be the requests that are checked for substantial similarity against the report list." (D.I. 179 at 11.)

Business Objects proposes that the term must be construed as a limitation (D.I. 91 at 11-12; D.I. 177 at 27-30), and that this limitation requires that the system:

> [s]ubmit a second request for a report through a network user interface to an OLAP system after the network user interface is blocked as a result of the submission of a first report request, such that the interface cannot accept report requests, thereby preventing a user from entering a second report request until after the network user interface is subsequently unblocked by a signal generated by the network server module in response to the submission of the first report request, the unblocking signal having been generated while the first report request is still being processed by an OLAP system.

13

(D.I. 161, Amended Joint Claim Chart.)  The requirement for blocking and unblocking in that proposed construction is similar to the one proposed for the "control means" of claim 1 (D.I. 91 at 14-15), and the parties agree that an asynchronous request requires some type of blocking and unblocking (*id.* at 12-13; D.I. 106 at 21-22; D.I. 179 at 11).

Thus, the crux of the dispute concerns whether the term "asynchronously" is a limitation at all and, if it is, whether it requires the report requests described in the bodies of the claims to have been submitted asynchronously.

> b.   The Court's Construction

> i.   "Asynchronously" is a Limitation

First, I conclude that the preamble term "asynchronously" must be construed as a limitation within claims 7, 8, and 21.

"[A] claim preamble has the import that the claim as a whole suggests for it." *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003).  "When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention."  *Id.*  Also, a preamble is limiting when there is "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art." *Intirtool*, 369 F.3d at 1295.

Here, the preambles of claims 1, 7, and 17 are a necessary part of the claims. First, the preambles provide an antecedent basis for three limitations in the bodies of the claims.  "[T]he network user interface" and the "users" in claim 7 and "the OLAP

system" in claims 1, 7, and 17 are first identified in the preamble. ('033 patent, 17:60-65, 18:32-36, 19:19-22.)  Second, during a reexamination proceeding, Microstrategy distinguished prior art references by arguing that all independent claims of the '033 patent required asynchronous operation and particularly pointing out the term "asynchronously" in the claim preambles.  (D.I. 115, Ex. C, Response to Office Action Mailed March 14, 2003, at 3 & Attachment A at 9-10.)  In deciding to issue a reexamination certificate, the Patent Examiner relied on Microstrategy's arguments and stated that "[a]ll claims recite asynchronous operations which are not taught by the art of record."  (Id., Ex. C, Notice of Intent to Issue Ex Parte Reexamination Certificate, at 2.)  Microstrategy may not use the "asynchronously" term in the preamble to distinguish the prior art and then ignore it when asserting the patent.[2]

Therefore, the preamble, and particularly the term "asynchronously", is a limitation within claims 1, 7, 17, as well as dependent claims 8 and 21, and I must construe the term.

                ii.      Report Requests must be Submitted Asynchronously

As earlier discussed, supra Section IV.A.1.a, the relevant dispute is whether the

---

[2]Microstrategy notes (D.I. 179 at 9-10) that claims 7 and 21 were also distinguished from the prior art based on the limitation involving a comparison of requested reports to previously requested reports.  (D.I. 115, Ex. B, Responsive Amendment Dated January 24, 2001, at 15.)  However, the reexamination proceeding makes clear that the "asynchronously" limitation was also cited as a distinguishing feature.  (Id., Ex. C, Response to Office Action Mailed March 14, 2003, at 3 & Attachment A at 9-10; id., Ex. C, Notice of Intent to Issue Ex Parte Reexamination Certificate, at 2.)

15

"asynchronously submitted report requests must be the requests that are checked for substantial similarity against the report list" (D.I. 179 at 11).  I conclude that they must.

First, the language of the claims themselves shows that the report requests referred to in the body of the claim are the same report requests that are submitted asynchronously.  The preamble of claim 7 describes asynchronous requests that are submitted by "users" ('033 patent, 18:32), and the requirement that the "report control means" add "a request made by **that user** to the report entry of a particular report in the report list" (*id*. at 18:43-44) has an antecedent basis in the preamble.  Thus, the requests handled by the report control means, which checks requests against the report list, are those submitted asynchronously by the users.

Similar linking language is found in claims 8 and 21.  The preamble of claim 1 describes asynchronous requests that are submitted by "users" (*id*. at 17:60-62), and dependent claim 8 describes a "report control means for comparing a request from **the user** to existing report requests" (*id*. at 18:53-54).  And the preamble of claim 17 states that requests submitted from a "user interface" are processed asynchronously (*id*. at 19:19-21), and dependent claim 21 adds a step for "adding a user to the report entry . . . if the report requested by **the user** is substantially the same as [a previously requested report]" (*id*. at 19:50-54).

Second, the written description of the invention is consistent with this claim language.  When the specification describes the system comparing a report request "with other pending or recently completed reports" (*id*. at 6:10-11), that comparison is intertwined with the asynchronous submission of reports.  (*See id*. at 5:65-8:32.)  The

16   ·

system compares a report request to previous requests (*id.* at 6:9-11) and then "returns control of the network interface . . . so that the user may perform other tasks" (*id.* at 6:25-27). The method shown in Figures 1 and 2 integrates the comparison and the return of control that embodies the asynchronous submission. (*Id.* at Fig. 1 & 2.) While these descriptions refer to preferred embodiments and do not limit the claims of their own force, they are consistent with my interpretation of the claim language and provide additional evidence of the meaning that language would have to persons of ordinary skill in the art.

Finally, in the context of the claim language and written description, Microstrategy's argument in the reexamination proceeding is highly significant. Microstrategy's current contention that claims 7, 8, and 21 relate to a feature that is separate from the asynchronous feature (D.I. 179 at 9-11; D.I. 191 at 26) is inconsistent with its dependence on the "asynchronously" limitation to distinguish those claims from the prior art during reexamination (D.I. 115, Ex.C, Response to Office Action Mailed March 14, 2003, at 3 & Attachment A at 9-10).

Therefore, according to claims 7, 8, and 21, the report requests that are checked against the report list must have been submitted asynchronously.

        2.    The '432 Patent

Claim 9 of the '432 patent is dependent on claim 6, and those claims read:

      6. A method for enabling the exchange of reporting system information over a computer network comprising the steps of:

          receiving at one or more web servers using HTTP a user request for reporting system information from a user system;

17

> transmitting the request to a reporting server;
>
> the reporting server executing the reporting request from a the [sic] client system **using and** transmitting the retrieved information to the at least one web server; and
>
> converting the report to HTML or DHTML and transmitting it to the user system without downloading any executable files;
>
> wherein the web server does not perform any reporting system operations; and wherein the reporting system comprises an OLAP system.

> 9. The method of claim 6 further comprising the step of providing a clustered set of reporting systems to process reporting system report requests.

('432 patent, 8:43-59, 9:7-9 (emphasis added).)

Claim 13 is dependent on claim 10, and those claims read:

> 10. A medium for causing it processor [sic] to enable the exchange of reporting system information over a computer network, the medium comprising code for causing a processor to perform the steps of:
>
> > receiving at one or more web servers using HTTP a user request for reporting system information from a user system;
> >
> > transmitting the request to a reporting server;
> >
> > the reporting server executing the reporting request from the client system **using and** transmitting the retrieved information to the at least one web server; and
> >
> > converting the report to HTML or DHTML and transmitting it to the user system without downloading any executable files;
> >
> > wherein the web server does not perform any reporting system operations; and wherein the reporting system comprises an OLAP system.

> 13. The medium of claim 10 wherein the medium further comprises code for causing a processor to operate a clustered set of reporting systems to process reporting system report requests.

(*Id.* at 9:10-10:3, 10:19-22 (emphasis added).)

The highlighted limitation from claims 6 and 10 bears some similarity to one in claim 1, which reads:

> the at least one reporting server executing the reporting request from the client system **using the at least one data storage device** and transmitting the retrieved information to the at least one web server . . . .

(*Id.* at 8:27-30 (emphasis added).)

### a. The Parties' Proposed Constructions

Business Objects argues that the phrase "using and" in claims 6, 9, 10, and 13 lacks an object, and is therefore an error in claim drafting. (D.I. 91 at 32-33; D.I. 110 at 14-15, 31-32; D.I. 214 at 4-7.) Because it remains unclear whether this error should be corrected by deleting the term or by adding an object, Business Objects contends that the claim is indefinite under 35 U.S.C. § 112. (D.I. 110 at 31-32; D.I. 214 at 4-7.)

Microstrategy agrees that the lack of an object is an error. (D.I. 188 at 38-39.) However, it argues that "[t]here cannot be any true debate here that this is a typographical error" and that "it is not intended to have any effect on the meaning of the claim limitations." (*Id.*; *see also* D.I. 179 at 17 ("[T]he words 'using and' [do] not alter the scope of the claim.").) In effect, Microstrategy proposes that the language should be ignored.

### b. The Court's Construction

"A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Personalized Media Communications, L.L.C. v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir.

1998). When considering indefiniteness, the district court can only correct an error in the patent if "(1) the correction is not subject to reasonable debate based on consideration of the claim language and specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1354 (Fed. Cir. 2003). In *Novo*, correction was not appropriate because "the nature of the error [was] not apparent from the face of the patent." *Id.* at 1357. In that case, it would have been equally reasonable to delete a phrase in its entirety or to add a word that was missing, and the court therefore found that the claim was indefinite. *Id.* at 1357-58.

Here, a comparison of the language in claims 6, 9, 10, and 13 with the corresponding language in claim 1 does suggest that the missing object for the word "using" is an error. Claim 1 includes the object "the at least one data storage device." However, as in *Novo*, there is more than one reasonable interpretation of the error. Microstrategy proposes that the drafter intended to delete the entire "using" limitation from claims 6, 9, 10, and 13, and so the words should be ignored. It is equally plausible that the object was deleted in order to replace it with another object because those claims had no antecedent for "the at least one data storage device." There is simply no way to know whether the drafter intended to delete the "using" term, to add the object "a data storage device," or to add some other object. (*See* D.I. 214 at 5.)

The prosecution history of the '432 patent provides no guidance. (D.I. 110 at 32; D.I. 214 at 6.) The claims contained the disputed language in the original application. (D.I. 120, Ex. E., Application at 17-18 (showing original claims 8 and 14 which were

issued as claims 6 and 10).) Thus, Microstrategy's reliance (D.I. 188 at 39) on *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1331 (Fed. Cir. 2005), a case where the prosecution history revealed an error in claim renumbering that resolved the ambiguity in a dependent claim, is misplaced.

Therefore, because the error in claims 6, 9, 10, and 13 cannot be corrected by this court, those claims cannot be construed and they are indefinite under 35 U.S.C. § 112. (*See infra* Section IV.D.2.)

B.      Summary Judgment on '033 Patent Infringement and Invalidity

1.      Infringement

Business Objects seeks summary judgment of noninfringement of the asserted claims of the '033 patent. (D.I. 101.) Because the parties agree on facts that, in light of my claim construction, require judgment of noninfringement as a matter of law, I will grant the motion. Accordingly, I will deny Microstrategy's cross motion for summary judgment of infringement. (D.I. 124.)

Microstrategy's infringement theory for the '033 patent is based on the "Schedule Now" feature of the accused products. (D.I. 125 at 29-31.) This feature allows the user to schedule a report and then returns control to the user so that the user can perform additional functions. (*Id.* at 29.) Thus, the Schedule Now feature satisfies the "asynchronously" limitation of claims 7, 8, and 21. (*Id.* at 30, 35-38; D.I. 191 at 20-21, 27-30.) All three of those claims also require report requests to be compared with prior requests so that the system can avoid the processing of duplicate reports. According to Microstrategy, those limitations are satisfied by the Cache Server, which "compares the

21

received request against the list of report pages that have already been processed . . . [and those] that are outstanding and have not yet been processed." (D.I. 125 at 36; *see also id.* at 37-38; D.I. 191 at 24-26, 29.)  However, Microstrategy concedes that the report requests submitted through the Schedule Now feature are not processed by the Cache Server.  (D.I. 125 at 37-38; *see also* D.I. 192, Ex. 2 at 195:8-196:12, 465:13-16 (Microstrategy's expert agreeing that scheduled reports do not go through the cache server).)  Thus, Microstrategy's infringement theory depends on the argument that "[t]here is nothing in the claim language that requires the requests processed by the "[report] control means" [,i.e., in their infringement analysis, the Cache Server,] to be the same requests that may be asynchronously submitted."  (D.I. 125 at 36; *see also* D.I. 191 at 25-26.)  Microstrategy uses this argument to support its infringement case for all three of the asserted claims.[3]  (*Id.* at 25-26, 29-30.)

Microstrategy's infringement theory depends on a construction of the claims that I have rejected.  *Supra* Section IV.A.1.b.ii.  Claims 7, 8, and 21 do indeed require the requests that are compared against prior requests to have been submitted asynchronously.  Based on that claim construction and the undisputed facts, Business Objects has demonstrated that there is no genuine issue of material fact concerning '033 patent infringement and that judgment of noninfringement is warranted as a matter

---

[3]Microstrategy makes its argument in its briefing, and also in a supplemental expert report for claims 7 and 8 that is the subject of Business Objects's Motion to Strike (D.I. 85).  Because, even if I accept the argument as timely, it fails in light of my claim construction, I will deny Business Objects's Motion to Strike as moot.

of law.[4]  Therefore, I will grant Business Objects's Motion for Summary Judgment as to

noninfringement of the asserted claims of the '033 patent and deny Microstrategy's

Motion as to infringement of that patent.

2.     Invalidity

Business Objects also seeks summary judgment of invalidity of the asserted

claims of the '033 patent.  (D.I. 101.)  Since Business Objects has failed to show that

there is no genuine issue of material fact on invalidity, I will deny the motion.

Business Objects argues that the "Crystal Info 6" product and manuals are prior

art under 35 U.S.C. § 102(b), and that they disclose all the elements of the asserted

claims.  (D.I. 102 at 28-37.)  However, that argument is based entirely on the assertion

that the Crystal Info 6 product performs the claimed functions "in the same way as the

accused products," so that, if the '033 patent claims are construed to cover the accused

products, then they must also be anticipated by Crystal Info 6.  (*Id.* at 30.)  The analysis

of each claim element is prefaced by the statement that the elements are disclosed in

---

[4]The conclusion as to infringement covers indirect, as well as direct,
infringement.  Nothing in Microstrategy's arguments (D.I. 191 at 33-34) supports a claim
of indirect infringement in light of the conclusion that report requests must be submitted
asynchronously.

Also, while Microstrategy raises the issue of infringement under the doctrine of
equivalents in its answering brief (*id.* at 30), it only provides evidence of literal
infringement.  (D.I. 125 at 27-38; D.I. 191 at 15-30; D.I. 213 at 16-17.)  This is
insufficient to support a doctrine of equivalents claim.  *See Schoell v. Regal Marine
Indus., Inc.*, 247 F.3d 1202, 1210 (Fed. Cir. 2001) ("The doctrine of equivalents is not a
talisman that entitles a patentee to a jury trial on the basis of suspicion; it is a limited
remedy available in special circumstances, the evidence for which is the responsibility
of the proponent.").  Furthermore, "[t]he evidence and argument on the doctrine of
equivalents cannot merely be subsumed in plaintiff's case of literal infringement."  *Lear
Siegler, Inc. v. Sealy Mattress Co.*, 873 F.2d 1422, 1425 (Fed. Cir. 1989).

Crystal Info 6, "if the claims are construed to cover the [accused devices]." (*Id.* at 31.) Thus, Business Objects's anticipation argument depends on a finding of infringement. Because I have concluded that the '033 patent is not infringed, and because no independent argument for anticipation has been advanced,[5] Business Objects has not shown by clear and convincing evidence that no genuine issue of material fact exists as to the issue of invalidity. Therefore, I will deny Business Objects's Motion for Summary Judgment as to invalidity of the asserted claims of the '033 patent.[6]

C.   Summary Judgment on '796 Patent Invalidity

Business Objects seeks summary judgment of invalidity of the asserted claims of the '796 patent. (D.I. 116.) Because Business Objects has presented clear and convincing evidence of anticipation under 35 U.S.C. § 102(b), and Microstrategy has failed to answer with any evidence, I will grant that motion. I will therefore also deny as moot Business Objects's motion as to noninfringement (D.I. 116) and deny

---

[5]Furthermore, Business Objects does not respond in its reply brief (D.I. 213) to Microstrategy's arguments about invalidity, suggesting that it regards the invalidity argument as secondary to the noninfringement argument.

[6]Business Objects's counterclaim for a judgment of invalidity of the '033 patent (D.I. 6 at ¶ 30) alone remains, after this opinion. As noted in the accompanying order, the parties should confer and inform the court as to whether the case will proceed to trial on that counterclaim, as well as which, if any, additional terms within claims 7, 8, and 21 of the '033 patent must be construed prior to that trial.

The validity of the '033 patent is the subject of testimony that Business Objects seeks to exclude in its Motion to Exclude the Expert Testimony of Peter Alexander. (D.I. 94.) That testimony also relates to the validity of the '796 and '432 patents and to infringement for all three patents in dispute. To the extent that it relates to testimony about validity of the '796 and '432 patents or about infringement, Business Objects's motion will be denied as moot. To the extent that it relates to testimony on validity of the '033 patent, a decision on the motion will be delayed until after the parties inform the court as to whether the case will proceed to trial on that issue.

Microstrategy's motion for summary judgment of infringement (D.I. 124) of the '796 patent.

Business Objects has shown that the "Crystal Info 6" product and manuals were in public use and on sale more than one year prior to the '796 patent application date of March 23, 1999 (D.I. 121 at ¶ 6 & Ex. 6-10)), and that they disclose all the elements of the asserted claims (D.I. 118 at ¶¶ 6-16; D.I. 119, Ex. 2, App. G at 1-14; *id.* at Ex. 5-10). Microstrategy responds with three arguments.

First, Microstrategy argues that the Crystal Info 6 product may not perform as described in the manuals. (D.I. 183 at 12-13, 19.) Microstrategy does not argue that the manuals are not an enabling disclosure, but rather that differences may exist between that disclosure and the performance of the software itself. (*Id.*) That argument fails to address the fact that the manuals are themselves prior art and provide clear and convincing evidence sufficient to support a conclusion of invalidity.[7]

Second, Microstrategy attacks the credibility of a Business Objects witness based on that witness's involvement with developing Crystal Info 6. (D.I. 183 at 14-16.) That witness, a Mr. Wu, testified from his personal knowledge (D.I. 118 at ¶¶ 6, 16), and his testimony is corroborated by the product manuals. Again, Microstrategy fails to provide any contrary evidence. "Summary judgment should not be denied simply

_____

[7]Microstrategy's assertion that the Crystal Info 6 product itself has not adequately been demonstrated to contain the limitations of the claims (D.I. 183 at 12-16) also comes up short. The affidavit of a Business Objects witness, when fairly read, shows that the product anticipates the '796 patent (D.I. 118 at ¶¶ 6, 16 (stating that the described functions were in "the product itself" and "the code for the product")), and Microstrategy has offered nothing to rebut that evidence.

25

because the opposing party asserts that the movant's witnesses are not to be believed."

*TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158 (Fed. Cir. 2004).

Rather, the opposing party must offer "specific facts that call into question the credibility

of the movant's witnesses." *Id.* Here, no specific facts are offered, and the testimony

corroborated by the product manuals shows anticipation by clear and convincing

evidence.

Third, Microstrategy asserts that Crystal Info 6 does not provide "predetermined

performance criteria," "administrator control over the processing and forwarding of

output," and does not "reduce duplicate reports." (D.I. 183 at 16-19.) However,

Business Objects provides evidence, again based on the product manuals, that, under

either party's claim construction, Crystal Info 6 contains those limitations. (D.I. 118 at

¶¶ 11, 12, 15; D.I. 119, Ex. 2, App. G at 8.) Microstrategy argues that, for the first of

those terms, the "predetermined performance criteria," I must first construe the term

before making an invalidity determination. (D.I. 183 at 16-18.) Its proposed

construction of "predetermined performance criteria" requires the system to use multiple

performance criteria to manage overall system performance. (*Id.*) Not surprisingly,

Microstrategy argues that Crystal Info 6 does not meet this construction. (*Id.*) But,

again, Business Objects provides specific evidence that the product does meet that

construction. One witness testified that "[t]he administrative user can specify what may

constitute predetermined performance criteria, such as the maximum number of jobs . .

. to improve performance of report viewing" (D.I. 119, Ex. 2, App G at 8), and a second

witness listed six other criteria (D.I. 118 at ¶ 11). Furthermore, according to the second

26

witness, the criteria allowed the administrator to manage overall system performance. (*Id.*) Thus, that claim element is present in the Crystal Info 6 product, even under Microstrategy's proposed construction.

For the other two terms, Microstrategy does not argue based on its proposed claim construction. (D.I. 183 at 19.) In the face of evidence that those elements are found in the Crystal Info 6 manuals (D.I. 119, Ex. 2, App. G at 9-10, 13-14) and product (D.I. 118 at ¶¶ 12, 15), Microstrategy simply argues its doubts about whether or how features in the manual were implemented in the product. (D.I. 183 at 19.) That response is not sufficient to raise a genuine issue of material fact.

Therefore, I will grant Business Objects's Motion for Summary Judgment as to invalidity of the asserted claims of the '796 patent. Because I conclude that the claims are invalid, I do not reach the issue of infringement.

D.    Summary Judgment on '432 Patent Invalidity

Business Objects seeks summary judgment of invalidity of the asserted claims of the '432 patent. (D.I. 109.) Because Business Objects has presented clear and convincing evidence of anticipation under 35 U.S.C. § 102(b) of claims 1, 2, 4, and 5, and because I have determined that claims 6, 9, 10, and 13 are indefinite, I will grant that motion. I will therefore also deny as moot Business Objects's motion as to noninfringement (D.I. 109) and deny Microstrategy's motion for summary judgment of infringement (D.I. 124) of the '432 patent.

27

1.     Claims 1, 2, 4, and 5 are Anticipated

Business Objects has presented evidence that the "Actuate e.Reporting Suite 4"
product and manuals were in public use and on sale more than one year prior to the
'432 patent application date of June 20, 2001 (D.I. 114, Ex. 4 at 39:24-44:21, Ex. 7 at
14:9-15:16, 22:7-22) and that they disclose all the elements of claims 1, 2, 4, and 5.
(D.I. 111 at ¶¶ 12-20; D.I. 114, Ex. 4 at 24:8-25:10, 29:19-32:6, 72:5-73:10, 75:9-77:6,
83:5-11, 87:14-89:15, 91:9-92:25, 98:1-104:4, 105:20-108:1, 118:10-126:14 & Ex.
2171.)  Microstrategy responds with four arguments.

First, as it did for the '796 patent, *supra* Section IV.C, Microstrategy argues that
the manuals are not sufficient to show how the product operated.  (D.I. 188 at 31-32.)
Again, that argument fails to raise a genuine issue of material fact; the manuals
themselves are clear and convincing evidence sufficient to support a conclusion of
invalidity.

Second, Microstrategy concedes that the Actuate product contains all the
elements of claims 1 and 2 (Tr. at 35:22-36:2, 38:7-39:2), and instead of disputing the
presence of the claim limitations, it argues that the Actuate manuals do not provide an
enabling disclosure.  (D.I. 188 at 34-35.)  However, that argument is based on the
unsworn report (D.I. 63 at 49-52) of an expert witness who admittedly did not review the
Actuate manuals in their entirety (D.I. 114, Ex. 3 at 303:6-304:20), which is insufficient
to raise an issue for trial.

Third, Microstrategy argues that the Actuate product does not disclose "a
plurality of reporting systems operating as a reporting system cluster" as required by

28

claim 4.  (D.I. 188 at 35.)  According to the parties' proposed constructions, a reporting system cluster is a group of reporting systems that act like a single server.[8]  (D.I. 161 at 26-27.)  Contrary to Microstrategy's assertion, the only evidence on that issue shows that the Actuate product does indeed disclose a cluster.  (D.I. 111 at ¶ 19; D.I. 114, Ex. 4 at 119:7-120:15.)  One witness stated that "under any conceivable construction, including Microstrategy's, an Actuate system could have a 'reporting system cluster'"[9] (D.I. 111 at ¶ 19) and referred to the Actuate manuals for support (id. at Ex. 3, BOCR 027730, 027742; id. at Ex.5, BOCR 028079 (disclosing multiple servers)).  A second witness stated that, in the Actuate product, "any number" of severs could be used, and "a single application can be split [onto different servers] . . . , [which] would operate independently, but . . . from the user's point of view it's a single system, even though on the server they are two different Actuate e.Reporting Servers."  (D.I. 114, Ex. 4 at 119:15-20, 120:2-10.)  Thus, Business Objects has presented sufficient evidence that the Actuate product disclosed a cluster, and Microstrategy fails to raise any evidence in rebuttal on that point.

Fourth, Microstrategy argues that the Actuate product does not have an OLAP system as required by claim 5.  (D.I. 188 at 35.)  Microstrategy makes this argument by simply referencing its proposed construction of "OLAP system," but fails to show how

---

[8]That definition of "reporting system cluster" is consistent with both proposed constructions, which appear to differ only slightly (see D.I. 161 at 26-27), and are not disputed in the parties' claim construction briefing (D.I. 91; D.I. 106; D.I. 177; D.I. 179).  In its argument that the Actuate system does not disclose a cluster, Microstrategy does not contend that the term must be construed in a particular way.  (D.I. 188 at 35.)

[9]The fair reading of the word "could" in this statement is that the Actuate product was capable of having a cluster, not that it might, or might not, have a cluster.

the construction matters. (*Id.*)  By contrast, Business Objects presents sufficient

evidence that the limitation is present in the Actuate product under either party's

construction.  (D.I. 111 at ¶ 20; D.I. 114, Ex. 4 at 120:16-126:14.)

In summary, Business Objects has shown by clear and convincing evidence that

no genuine issue of material fact remains concerning the anticipation of claims 1, 2, 4,

and 5.

2.   Claims 6, 9, 10, and 13 are Indefinite

As earlier discussed, *supra* Section IV.A.2.b, I conclude that claims 6, 9, 10, and

13 are indefinite because the term "using and" lacks an object.  Business Objects

argues that those claims are also anticipated by the Actuate product (D.I. 110 at 21-23),

but that argument depends on the disputed construction of the term "converting the

report to HTML or DHTML" (D.I. 91 at 33-34; D.I. 106 at 14-17; D.I. 188 at 32-33; D.I.

214 at 14).  Because those claims are invalid for indefiniteness, I need not, and do not,

address the issue of anticipation of those claims.

Therefore, I will grant Business Objects's Motion for Summary Judgment as to

invalidity of the asserted claims of the '432 patent.  Because I conclude that the claims

are invalid, I do not reach the issue of infringement.

**V.   CONCLUSION**

For the reasons set forth herein, I will grant Business Objects's Motions for

Summary Judgment as to noninfringement of the '033 patent (D.I. 101) and for

Summary Judgment as to invalidity of the '796 patent (D.I. 116) and the '432 patent

(D.I. 109). Consequently, I will deny Microstrategy's Motion for Summary Judgment as to infringement of those three patents (D.I. 124). I will also deny Business Objects's Motion for Summary Judgment as to invalidity of the '033 patent (D.I. 101) and deny as moot Business Objects's Motions for Summary Judgment as to noninfringement of the '796 and '432 patents (D.I. 116; D.I. 109).

Business Objects's Motion to Strike (D.I. 85) and Motion to Exclude the Expert Testimony of Richard Troxel (D.I. 97), as well as Microstrategy's Motion for Leave to File a Supplement to its Opposition (D.I. 219) and Motion to Dismiss Certain Counterclaims Relating to the '033 patent (D.I. 223) will be denied as moot. Business Objects's Motion to Exclude the Expert Testimony of Peter Alexander (D.I. 94) will be denied as moot to the extent that it relates to testimony about validity of the '796 and '432 patents or about infringement of the '033, '796, or '432 patents.

The parties should confer and inform the court within ten days as to whether the case will proceed to trial on Business Objects's counterclaim for a judgment of invalidity of the '033 patent, as well as which, if any, additional terms within claims 7, 8, and 21 of the '033 patent must be construed prior to that trial. To the extent that it relates to testimony on validity of the '033 patent, a decision on Business Objects's Motion to Exclude the Expert Testimony of Peter Alexander (D.I. 94) will be delayed until after the parties inform the court as to whether the case will proceed to trial on that issue.